We'll call the first case for the morning, and that is Disability Rights NJ v. Commissioner NJ Is that Mr. Mamet? Yes, sir. May it please the Court, I am Nathan Mamet. I'm from the Department of Criminal Justice. I'm here on behalf of Disability Rights NJ.  Granted. This case is about whether the State of New Jersey can, in the absence of an emergency, forcibly medicate competent persons in state mental hospitals without a judicial guarantee, when no other group, no other illness can be forcibly treated without a judicial guarantee. The policy on the issue would even apply to those persons who have been cleared to leave the facility by a judge, because a judge has determined that they are no longer dangerous as necessary to justify civil commitment. An application of the policy that the District Court recognized cannot be justified in New Jersey. A major fault line in this case, of course, is between the SEP patients and the non-SEP patients. Could you just, for background purposes, outline for us the differences in treatment, as well as any differences in accommodations and living conditions at the institution? Well, the SEP patients, as Your Honor alluded to, are certainly in a separate class, and since they've been, the judge has determined that they are no longer dangerous as necessary. That is a matter of legal categorization. But I'm asking about something that I don't think really appears in the briefs, and that is just trying to get a sense of living conditions themselves. Are the SEP patients isolated from the non-SEP patients, or do they all interact, or are they all subject to the same treatment and other conditions during the course of each day? Your Honor, my understanding, of course, starts with the New Jersey courts have instructed that CPP SEP status patients are supposed to be maintained in a means-restricted environment. That's a legal point of the nature of how that they will remain in these hospitals. But as far as the nature of practically what goes on in the institutions, my understanding is most of the institutions have generally a two-level type of facilities, the general population and maybe a more restricted environment as necessary for certain patients. And these individuals live in the general community, they're in the general community of patients, depending on the hospital. I frankly don't know the specific ego of all the hospitals, but they are generally living with most of these other patients in the general living environment population. But they've been determined that they're ready for release. The only reason why they are in these hospitals is because the state has an obligation to find a place for them that's appropriate in the community, and it's waiting on the state to fulfill that obligation. And one cannot obtain SEP status unless one has been deemed to be dangerous. I know the language is no longer poses a likelihood of serious harm to himself, others, or property, but shorthand, they're no longer deemed dangerous. And the only reason for forced psychotropic medicine is because a patient is dangerous without it, is that correct? Well, that is the justification the state has given me. The only reason is because they would be dangerous. A for Shiorai, then, SEP status patients could not be involuntarily medicated with psychotropic drugs. Absolutely. And Judge Debevoise seemed to believe, and candidly, from what I've read, the parties did not disabuse him of this, that all SEP patients continued to be forcibly medicated because there was a risk that their mental condition would fluctuate, or could fluctuate. Is that, is it correct? Is my understanding correct? And Judge Debevoise was not explicit, but he certainly strongly implied that placed on SEP status did not stop the forced medication because of the risk fear that SEP patients could have a fluctuating... Am I correct on that? Yes, sir. The state's justification, the state's argument here... You're saying so many words, and only do I pick up this argument from one sentence in your yellow brief and then page one of the gray brief. The justification for why the state claims as authority to enforce the medication is that they may in the future be dangerous. Not to be part of dangerous, but they may in the future be dangerous. But they've been found to be non-dangerous by a court. Exactly. Which is why they're subject to this. Exactly. Just like any person on the street, they could go back to presumption of being non-dangerous. Let me just ask you about that procedurally, Judge Berry. Just ask that they were found by a court to be non-dangerous. I am not clear, and it's my fault, on just how the patient transitions, if you will, from being institutionalized subject to involuntary commitment to then having reached this point where they qualify for SEP status. Does this occur simply from a procedural lapse over time to not recommit them, which I think is required, what, about every 90 days? Or does it require an affirmative determination that they are no longer a danger to themselves or someone else? The process is that there's a periodic review for the status of commitment. And that ties in with our due process arguments as well. This is not asking much to provide a judicial hearing for any voluntary medication. But there's a periodic review for the status of whether a person meets the qualification to be involuntarily committed. And at that periodic review, the state fails to use the burden of showing that these people are, in fact, dangerous. They then transition to this SEP status. And just one other thing I think is interesting. Judge Delacroix entered an injunction in this case over a year ago. The state never moved to stop that injunction. Presumably, we're living under the injunction, and there have been no problems. In fact, the state even admits in its brief that this policy has only rarely been applied to the CPP status of patients. So it's a totally unnecessary policy, given the nature of these liberty interests of people who have been transitioned to this SEP status. Well, you were, in fact, toward the end of it, right? At the end of his opinion, he speaks for the first time, and this is what comes out a little bit in the reply briefs here. There's now a discussion when someone now becomes dangerous again. When a SEP patient now is dangerous, so there's a real reason to believe he has become dangerous and poses a serious risk to others and himself, then what is the procedure that must be followed, aside from the emergency at medication, which is only for 72 hours, and that's not challenged here. Once that is done, what is the procedure? Must there be a commitment procedure, or will a panel of medical professionals deciding that he's dangerous again be enough? That's really the question. And to that question, the point is that, first, as you point out, the state does have the emergency procedure to deal with any imminent issues that it needs to deal with. The state can then seek to recommit this individual under a fine or third danger. But your position is that's still not enough, right? Even if they do recommit the patient subject to involuntary termination, there's still a need for a judicial procedure for the involuntary administration of psychotropics. Yeah, that would be a commitment. That's what happened to the judge in the state. We're going to recommit this person, and this person needs to be treated for danger. But you didn't really answer my question. I understand you're saying they can do it at that stage, but their position is we don't have to, we're not doing it, a judicial determination is not necessary. Overall, your point is, irrespective of involuntary termination, there's got to be a judicial determination, because judges know better than trained psychiatrists and others know. Well, it's not that judges know better than trained psychiatrists. Judges, this is a quintessential judicial function to balance the rights of one individual against others. Judges hear these committment hearings, which are a matter of issue. Is this person dangerous? What's the nature of this illness? Hasn't the Supreme Court basically said, what do judges know? This is a medical question, essentially. Was that understood? Was that the case? I believe you're referring to the Harper case, and that was in the context of prisons, and there was a much different regime where prisoners had much fewer rights, much different liberty interests than we're talking about people. I don't recognize what that has said. This is a medical question. No, it's a public medical question. It's also a question of dangerousness. This is a public medical question. In the anti-psych case, in our yellow brief, there was a Supreme Court making a point that dangerousness is a judicial function. We're thinking of dangerousness as balancing whether this individual meets a particular standard, whether this individual is a threat to others, balancing the restrictions they can impose on someone else. But when it comes to the judge, the judge will have. The procedures here before one can be forcibly medicated are really quite extraordinary. I mean, they're thorough. There's this review. There's that review. You can have help. On and on it goes. And there's an awful lot of medical input before it gets to the judge. The judge isn't deciding this, or shouldn't be deciding it in a vacuum, you know. I don't think. No, no. I'm not asking if the judge is a medical input. It's very serious. What's the matter with having a judge look at it? I mean, look at what the psychiatrist said. Look at what the medical professional, what the panel said. And then. That's, you know, I don't think I understand the question correctly. I think what we're asking for is that the judge looks at this. No, I'm saying there's nothing wrong with it. You seem to say the judge. No, I see what you're saying. Okay. The state can't bring the same evidence, the same procedures, that the judges aren't going to give preference to the treating psychiatrist. But that's not the issue. I misunderstood what you were saying before. I'm all for it. No, I'm sure the judges need to balance. The judges need to give those evidence to balance the rights of the individuals against the standards that need to be applied. Is there underlying your position that some kind of judicial process is necessary? A belief that the existing New Jersey practice is somehow biased or lacking in the kind of disinterest that you believe would be present were some more judicial-type process what is required? Well, certainly I think you're on the right track. If I may, can you continue to answer the question? Yes, yes, please, sir. Certainly, we're not suggesting, and I think everyone can see that this is a difficult issue, and these people, we would presume, and there's no reason to think that these aren't dedicated public servants. But any time you have the decider, the person advocating for this is the treatment, doctors, the theory that doctors are the best, and sometimes we have a right to refuse treatment. We say we don't want this treatment. We balance the risk. This is the point where it's not that the doctors are somehow bad. It's that this is a full right that people may want. What does a judge contribute? That's what I'm asking. Wasn't 504B, in its current iteration, really a response to Harper, at least in part? Well, certainly, they copied Harper. And isn't there, built into 504B, considerable components of disinterestedness, if you will? I mean, we have an advocate, first of all, a disinterested, I mean, I shouldn't say disinterested, an interested advocate in the well-being of the patient, right? Aren't there, aren't there, is the answer yes? There is an advocate. I mean, we, you know, We're talking about a process, and I'm not aware of you having mustered any evidence suggesting that somehow that system is infested with incompetence, have you? Well, no, there's a point on our official challenge. But your response did seem to try to impugn just the effectiveness of these CSAs, didn't it? Well, we think that the policy on itself, where the hospital policy of hospital people are providing the advocate on behalf of the person being medicated, I mean, it's not impugning anything evil against these people. These are people that are employees of a hospital versus, you know, an employee of a lawyer's or someone who can represent these people. And the process is key to providing these individuals the same rights as every other person in New Jersey, which goes to our ADA argument that every other person in New Jersey will not have the right to refuse treatment until they've been proven absolutely poor. It's only for mental illness that they are subject to this extrajudicial procedure that's governed by the hospital rather than judges. I'd like to ask you a question about that ADA claim. What is the service program or activity of the state from which your clients are excluded? The service program activity would be the right to refuse treatment that will not be able to work on at a judicial hearing, only by a judicial hearing. I'm not sure a right... You just said the right. Your clients have rights. I'm asking what to define specifically. What is the service program or activity of the state that your constituents are being excluded from? Let me rephrase it this way. I guess maybe it's more clear. It's the process that the state provides. If you have a right to refuse treatment that the state recognizes, that process is... I'm sorry, I'm going to ask you to slow down. I'm sorry. Please define as succinctly and slowly as you can. Because I think this is critical for the ADA claim. What is the service program or activity? You started by saying it's a process. So... What process? A judicial hearing. Okay. All right. Then it's not about forcible medication. You agree that people can be forcibly medicated, but you say they can't be forcibly medicated unless they have a judicial hearing. Correct. Then what other New Jerseyans are forcibly medicated without a hearing? There are no other New Jerseyans. Then how can your clients be discriminated against? They're not being treated differently than anybody else. Well, maybe I misunderstood your question. No other New Jerseyans would be forcibly medicated without a judicial hearing. We signed a case, Syrian War v. JSTO... Which New Jerseyans are forcibly medicated with a judicial hearing? I am not aware of a case where there aren't visiting. There are not. So... I know it's being discretely treated. Well, certainly if one group of people... And let me address this. It's very similar to the Harvard case in the Second Circuit where there was a durable power attorney with the ability to set limits on your treatment and have it respected, where they treated the person with mental illness differently than everyone else who can have a durable power attorney that's protected, that's respected, that cannot be overridden, absent a court order. That's exactly the same situation here. These people have a right to refuse treatment that will not be overridden for any other illness except for a court order. And by the way, we're not talking about an emergency situation. You can't forcibly medicate without a court hearing. Oh, of course. That's not a challenge. There's... Exactly. That's not challenged here. We're not challenging emergency exceptions. That would be a different discussion. I'll let Janet come in for this time. Thank you. We'll have you back on rebuttal, Mr. Mabern. Mr. Feinstein. Good morning, Your Honors. Again, I think it's clear from the argument that's been presented so far that we all agree that the state is not powerless to deal with a very difficult situation, mainly when you have psychiatric patients who, from medical standpoint, to good faith, would be dangerous without a utilization of psychotropic medication. I want to ask this question because it just has not been clear. It's not clear in Judge Deborah Royce's opinion, his masterful opinion, and I don't find it clear from the briefs. It was clearly, in my view, Judge Deborah Royce's impression that even though a court had found set patients not dangerous, that's a shorthand, correct, they were not being... could not be discharged until an appropriate facility was located, but that the state was continuing to forcibly medicate them on the theory that their mental condition can fluctuate. Is that correct or is that incorrect? That's incorrect, Your Honors. So who were they forcibly medicating once set status had been granted? And where does Judge Deborah Royce mention that in his opinion? I think what's going on is when somebody goes on to set status, it means that the determination has been made that no one is dangerous, but there is no appropriate place for them. That's right. And the reality is, as you pointed out in our papers, most of the patients who are on set status are medicated because the medication is beneficial. But what is it? Voluntarily, that is. I'm talking forcibly medicated. The only people who would be forcibly medicated would be CPP set patients who over time in some way deteriorated their condition. Okay, but they've been found non-dangerous. Right. So Judge Deborah Royce's strong implication is correct that you continue to forcibly medicate, set patients because they could become dangerous over time. That's not correct, Your Honor. Then tell me why. The way it would work is the following. Let's say on January 1 a patient goes in to see set status, and let's assume they're not medicated, they're not dangerous, correct? Right. And let's say you only see set patients, you only get out of the facility within three or four months. But let's say four months pass, it's April 1, and unfortunately the patient's condition has gone worse. The patient now is exhibiting signs of dangerousness. Why not re-condemn the patient? We don't believe that that is necessary. I know you don't, but that's exactly the problem here. Judge Deborah Royce did. That's his problem with this case. He said there was no legitimate reason for the state to voluntarily medicate. We disagree. The very same reason to allow the state to voluntarily medicate a patient is not on the CPB status that would apply there. Let's assume the state does have an interest. Let's assume that was a bit of an overstatement by the trial court. The state does have a legitimate interest. Don't you still have a problem under the Matthews v. Eldridge balancing test? Why not just, as Judge Smith just said, it seems like a no-brainer under Matthews v. Eldridge to recommit these folks? Because I believe that the recommitment is really the decision to voluntarily medicate is not centered on the issue of the commitment status of the patient. But they wouldn't be set status if they were not dangerous, right? The problem is that a patient, a psychiatric patient, we must keep in mind that the people who are in state psychiatric hospitals by definition have very serious psychiatric illnesses. Unfortunately, the condition does not necessarily remain static, particularly if the patient is no longer on medication. So this is why you continue to medicate people on set status. No, we don't. They know. Also, they do volunteer. We're not talking voluntary. We're talking involuntary administration of psychotropic drugs. In fact, you're very cute, careful to call it you have an obligation, and you do, to continue medical treatment. You don't define medical treatment. I define it as I read what Judge Debevoise did, continue to forcibly medicate non-dangerous people without any procedures. That's not all, Your Honor. I don't know what else to say. The patients who are in CPP status who are not medicated, we do not wholesale voluntarily medicate them. Involuntary medication. So why do you then involuntarily? What must happen for a staff at one of these institutions to involuntarily medicate a patient? The CPP patient? Yes, the CPP. What has to happen is that their condition has to change. The treating physician has to evaluate them, determine that they would be dangerous without the medication. Doesn't that meet the requirements of the statute for involuntary commitment? The standard is similar, but the evaluation is very different. It's much more... What do you mean by that? In other words, a decision whether to medicate or not requires a very complex evaluation of the patient, the patient's medical history, the review of the patient's medical records. So you mean there are dangers to oneself or others or property that could justify the involuntary administration of psychotropics but not be a basis to involuntarily commit something? It could be both. If that's the case, give me an example. It could be both, and there may be enough grounds to do both, but we have to keep in mind that we have to look at the patient here. The patient may have been in the institution for a number of years, and through the efforts of the patient and the treatment team have gotten to the point where that patient is ready to leave the institution once they're for permanent placement. It's a very big step when the decision is made by the court, usually with the consent of the state, to decide that the patient should no longer be committed. If the state has to always go through that, how can... You know, when I was young, which Judge Berry will immediately concede was a hell of a long time ago. I never say a thing like that. I serve for years, but you do it anyway. I served for a period of time as a mental health delegate under Pennsylvania's Mental Health Procedures Act, under Section 302, involuntarily committed. This is not an extraordinarily process-laden ordeal as we have it in Pennsylvania. I would assume that our process is not radically different from what you have here. Why not just go through the involuntary commitment process? And I have yet to hear a clear explanation from you to that question. Because the question is being resolved, and the patient is different than the involuntary commitment process. Different doesn't mean so more difficult. You can take it more as the additional intrusion on the person. I think that I can't speak for Judge Smith, but I hear him saying, and I'd like to know, why would it be so difficult? Because just telling us it's different doesn't matter. It doesn't get you to get us to reverse Judge Eberholtz. You're going to have to show us why it's so hard, or so onerous, under Matthews-Villalooge balancing. You mean in the CEP status? Yeah, well, my understanding is you've got a regular stream of hearings occurring at these institutions. Folks are constantly coming in and doing these things. Again, I've never been there, I don't know. It seems really easy to recommit someone. Tell me what I'm wrong. Well, that may be. It's not that it seems easy to recommit someone, but that's It's not deemed to be dangerous enough that you're going to involuntarily medicate them. Isn't it easy to recommit that person? It's a similar issue, but again, the calculus and analysis is different. If you look at Washington v. Parker, the court there was dealing with a prisoner who was in a sexual offender center because he was mentally ill. The court, as you know, allowed for a procedure that is very similar to what the state follows. Nowhere in that decision did the court say, we're not going to allow for involuntary recommendation without a separate commitment hearing. The court didn't believe that was necessary. And the fact that it focused on was the nature of the determination again, that it's a quintessential medical determination. Mr. Feiglin, I'm sorry, but this panel has asked numerous times, and I must confess personally, I am at a loss to figure out why the state of New Jersey wants to be able to involuntarily administer psychotropics to CEPP patients as you have in the past, for any reason other than you want the advantages of involuntary commitment on the cheap. I'm sorry, I just can't figure it out. But we believe that it's a more severe and better procedure to determine whether the medication should be administered voluntarily. You've got a court having found their dangerous. I sound like a broken record. Now in your reply brief, now it's almost, it has to be a subsequent decision. Well, if you're going to do a new finding of dangerous, now we have reason to believe there's a substantial risk he is dangerous. Why wouldn't you go through it again? That is one option. Do we believe that the decision-making process has indicated that Washington should be harmful to the question of... That's a prison case. That's a prison case, right? Right. We're talking about prisons. Maybe, I guess the answer is there is no answer. We're challenging you time and again to give us a reason why. Well, the reason again is that we believe that the better procedure for evaluating whether the medication should be given to somebody voluntarily is not to go before a court, but before an independent group of medical experts. Let's stipulate for a minute that perhaps you're right on that. Right. All that does is cause you to sustain the district court's opinion for the non-CEPP patients. We've been focusing on the... No, we believe that they should still sustain for the CEPP patients because, again, there has to be... We believe the same analysis that goes into non-CEPP patients has to be primary in terms of the risks and benefits, the weight of the personal liberty interest versus the institutional interest. And the day after a patient is put on CEPP status... Correct. ...you can decide then you're going to forcibly medicate him because we would reason to believe... Without more, you could get yourself a little panel... I'm sorry, what? Get yourself a little panel the next day.  Of course it's unlikely, but that's, of course, that's the way that we do geo-observe and that's how cases are decided sometimes. Right, and yet... The state, after a court has determined that he should... he can be released because he's not dangerous, you just say, well, maybe he'll become dangerous in the future because it's... No, we would never do that. We would only do it, let's say, once a month at least. But wouldn't you have to, if you're doing it in the first place, you'd have to have him committed. We don't believe that that's constitutionally required. Nothing that proceeds can go on in the four mental hospitals over the years. The figures are staggering. We're not talking about a whole panoply of, you know, Margaret E. Madison and courtrooms like this. Right. It's a simple thing, isn't it? It may be simple, but we think it's the law of form. And we believe that Washington, D.C. Harper said, constitutionally, you are not required to make such decisions in judicial panels. The better way, probably the way that better protects the interests of the patients is to have a panel of independent medical personnel evaluating the circumstances to know, though, to decide whether it is medically appropriate to override a patient's field of vision or consent to medication. So you don't think that the policy that you espouse might have the risk, at least, of being an invitation to use psychotropics solely for patient management purposes, where an institution is, for lack of a better term, stuck with a CEPP patient until you can find a more appropriate residence for him? Well, it's not done for management. I asked about risk. I asked about risk, not whether it was done routinely in that manner. Well, we think when we exercise the policies and the policies of the faith, and the policies of the design, certainly we deal with dangerousness. That's clear. But also to promote the treatment options of the person, of the patient. What we do with the CPP status situation is we are looking to help that patient to meet the institution. And if they end up having a situation where one staffer will go into CPP status, they start to compensate and start acting in a way that shows dangerous actions and proclivities, we take steps to medicate them, not to punish them or control them. We want them to get better so that... Once you do that, they might not be ready to leave. It depends what the policy... Which is why it's good to do a recommitment to determine whether the person should be on CPP status or take it off. I should mention, by the way, that the number of situations where we involuntarily medicate CPP patients is very, very small. It's a very handful of patients. And one of the primary reasons I said before is that medication is a key tool that has to be used to make patients better. And once they are under proper measurement plus with additional therapy and counseling, they are in a position to leave the institution. The problem we have in very rare circumstances is where a decision is made by the patient to stop taking the medication. And then over some period of time, the patient reverts, unfortunately, to a dangerous low fall. And the question then is, can we utilize the procedures that we have in place that apply to other patients for involuntary medication? This question is solely for informational purposes. And it is about an adjunct, effectively. But how does conditional release work? And in what respects is it different from CPP status? I know it's significantly different. Conditional release is if someone is actually released from the institution on their behavior and where they may live and that kind of thing. Behavior, perhaps, including a requirement that they take medication. That's correct, correct. But you're relying upon their volunteerism. Yes. And unfortunately, the reality is that a number of the people, patients who may go back to institutions who have been released are those who decide from their release not to continue to take medication. So, again, this is something that I'm not clear on. What is the difference in the medical status of a CEPP patient and a conditional releasee? I mean, is the CEPP patient CEPP only because the professionals at the institution cannot find a residence for whatever reason for this person? Otherwise, they would be released? Right. Or might they otherwise be a candidate for conditional release? I think it really depends upon the patient. But the normal reason is that the patient is not in a position to live on their own unless they leave the institution. They have to be put in some type of group home or some type of placement. And unfortunately, those facilities are not readily available. Or even with family, correct? Right. Although there's a determination made that the family is not in a position to care immediately for the patient who might be in the institution for some time. I thank you very much, Mr. Feinblatt. And I would ask Mr. Manning for his reply. Thank you, Your Honor. I'd like to make three points, if I can. I'd like to start first with something that a questioner pointed to, Joe Harbin, made about this. Procedurally, this is about the Matthews-Gonzalez test. As it relates to the CEPP status of patients, I think it's important to remember that the greater important interest of these patients is to maintain that they've been judged to normally meet the status or commitment. So they have that greater important interest. What's important to the state? You heard my colleague here just got here and say that it's very, very rarely applied. And as I mentioned, this policy has been enjoined with respect to these patients for the last year. There is no extra burden, there's a minimal extra burden to the state from not applying this policy to those patients. None that they've articulated or in the briefs. Right, right. And to Judge Berry's point, the problem is that it's actually identified. The very next day, January 1st, they can be put on the CEPP status. January 2nd, a state panel can determine, we think this person is dangerous and should be forcibly medicated. Reaching the same essential inquiry for dangerousness that the judge determined the day before. Which is really what Judge Debevoise was saying. I'm sorry? Which was really what Judge Debevoise was saying. Exactly right. He signed this under the procedure due process. He also applied it under the substance standard. This just doesn't seem right. It cannot be right. Now for me, I just want to go to the point Judge Harmon asked me about. What is a program of service for disability? Identify the process. And I still believe that's important. But I would also encourage the court to think about it. For clarification, for me, in response to Judge Hardiman's question. Were you saying that the process is a service? I wasn't clear on that. I took it to be asking you definitionally about the terms of art that the statute employs. And I took you to say that process was a service. Your Honor, let me slow this down on my end. I apologize. I believe it is in, I don't want to say the Dover versus County Center. I may be wrong on the court case. But it's signed under our briefs. A case filed in this court. Explaining, excuse me, the ESF versus Pennsylvania prisons case. For this court to explain the process. Programs of service for disability. That's, excuse me. Activity. Activity, thank you. It's a judicial hearing. But it's anything that the state does. That's not the correct answer. It's very broad. To show you my cards. The reason I asked that question is your brief sort of toggles back and forth between arguing that the service program activity is forcible medication on the one hand. And then at other points, it's the judicial process. I thought it was the right to judicial hearing. So your answer was consistent with what I thought you were doing. My problem with your answer, and I'll give you a chance to persuade me otherwise, is that that doesn't help you with the discrimination claim under the ADA. Because as you pointed out, there aren't any other jurors here who are being forcibly medicated. Well, I refer, of course, to the Harvard case from the Second Circuit. Where there was an issue of only persons with mental illness are having their on the judicial hearing. That's a very analogous situation to what we're dealing with here. But even beyond just the process, the Holmes case, the Supreme Court, also makes clear that you can't discriminate in provision of medical services. And certainly, if you want to look at this broadly about the provision of medical services to people in these institutions, to say that only certain illnesses will be subject to this process. And other illnesses, whether you have heart disease, HIV, any other treatment, that they're not forcibly medicated. They are. But that's the issue. If alcoholics, TB patients, heart patients were forcibly medicated, and they got a judicial hearing, it would seem that was a slow and dumb case. Because then, only the mentally disabled are being deprived of a prior judicial hearing. I guess, let me explain this with the... It's not that the state could not try to seek to forcibly medicate these people. The state has that ability through the Henry Conway state Supreme Court case that we cite in the briefs. Talks about the justifications for when you can override a person who has refused treatment. One of those may be if a person is dangerous to themselves or dangerous to others. But the issue is not that no other person is being forcibly medicated. It's that if the state wants to forcibly medicate those individuals for those illnesses, they have to follow the process of the judicial hearing. Thank you very much. Thank you, Your Honor. We appreciate the very hopeful arguments of both sides. We'll take the case under advisement.